**SECOND DIVISION**
**DOYLE, C. J.,**
**MILLER, P. J, and REESE, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**June 16, 2017**

# In the Court of Appeals of Georgia

A17A0264. YANCEY v. THE STATE.                                    DO-010 C

DOYLE, Chief Judge.

After a grand jury returned an indictment for second-degree burglary[1] against him, William Todd Yancey filed an application for interlocutory appeal from the trial court's order denying his motion to quash the indictment. This Court granted Yancey's application, and he appeals, arguing in six separate enumerations of error that the trial court erroneously denied his statutory right to notice and to appear before the grand jury pursuant to OCGA § 45-11-4 (c), (g) (2015) and OCGA § 17-7-

---

[1] OCGA § 16-7-1 (c). The indictment simply alleges that Yancey and several other individuals entered the office with the intent to commit theft, but it does not specify what was taken.

52 (a) (2015),[2] and the trial court erred by allowing into evidence a copy of the videotape of the purported entry into the office. For the reasons that follow, we reverse.

We review the trial court's interpretations of law and application of the law to the facts de novo and its findings of fact for clear error.[3]

The record reveals that Yancey worked for a number of years under Sheriff Ladson O'Connor as an investigator primarily responsible for property crimes at the Montgomery County Sheriff's Department. On the night of June 15, 2015, Sheriff O'Connor died as a result of a wreck during a high-speed chase of Jim Lowery, whom Yancey had been investigating. Lowery fled after the crash, and a manhunt quickly ensued involving numerous police officers from multiple jurisdictions. That same night, Sheriff O'Connor's individual office within the Sheriff's Department was

---

[2] In 2016, an amendment deleted OCGA § 45-11-4 (c) and (g) effective July 1, 2016. See Ga. L. 2016, p. 186, § 8/HB 941. The language of those deleted code sections was recodified in OCGA § 17-7-52, also effective July 1, 2016.

[3] See *Wiggins v. State*, 280 Ga. 268, 269 (1) (626 SE2d 118) (2006) (implicitly applying this standard in review of the trial court's determination of this issue). See also *State v. Bair*, 303 Ga. App. 183 (692 SE2d 806) (2010) (applying this standard to the trial court's ruling on a motion to quash the indictment based on a plea-in-bar); *Smith v. State*, 297 Ga. App. 300, 302-303 (1) (676 SE2d 750) (2009) (implicitly applying this standard to review the trial court's determination of this issue), affirmed by *State v. Smith*, 286 Ga. 409 (688 SE2d 348) (2010).

opened, and a safe and possibly other items were removed by individuals who worked at the Department.

On February 1, 2016, the district attorney presented the facts of the case to the grand jury, which returned an indictment against Yancey, charging that he individually and as a party to a crime "without authority and with intent to commit a theft therein, enter[ed] the office of Sheriff Ladson O'Connor . . . ."[4] It is undisputed that Yancey was not served with notice of the grand jury and did not appear before it under OCGA §§ 17-7-52 and 45-11-4. Thereafter, Yancey moved to quash the indictment, arguing that the State violated his rights to notice and an opportunity to appear and present a statement to the grand jury. Yancey did not testify at the hearing; however, his attorney argued that Yancey had entered O'Connor's office that night through the already-open door to retrieve Lowery's case file, which he thought might contain information helpful in ascertaining Lowery's whereabouts.

At the hearing on the motion to quash, Jerry Sikes, O'Connor's administrative assistant, testified that O'Connor maintained an office in the Sheriff's Department, which office he locked when absent because some items kept in the office had

_____

[4] Five other individuals were charged, including Joey Fountain, Matthew Waller, Brandon Braddy, Brent Braddy, and Kathy Rudd.

disappeared prior to the events in question. Sikes also testified that Yancey frequently used the office during work hours. Sikes testified that he was second in the chain of command and was responsible for scheduling but was on vacation out of state when O'Connor died. Sikes testified that Yancey and the other investigator (Matthew Mallory) shared on-call duties for nights and weekends when they were not working — their normal shift being 9:00 a.m. to 5:00 p.m. Sikes testified that Yancey sustained a gunshot wound about two weeks prior to O'Connor's death, but he continued to work full-time after the injury.

Matthew Mallory, a deputy with Montgomery County, was called into work the night of O'Connor's death. Mallory first arrived at the Sheriff's Department where he stayed for about 45 minutes, and as he was leaving, he met Yancey in the parking lot. Mallory then went to the crash scene, and finally arrived at the mobile command station at 10:30 p.m., where he saw Yancey around 11:45 p.m. or 12:00 a.m. Malloy testified that Yancey was involved in the discussions about Lowery at the mobile command station, and although he could not remember whether Yancey was there all night, Mallory recalled seeing him the following afternoon. Mallory testified that Yancey was working during the weeks between his injury and O'Connor's death.

4

Justin Fountain,[5] the other investigator on the Montgomery County force, testified that Yancey worked during the time between his injury and O'Connor's death. Fountain testified that on the day of O'Connor's death, Yancey had been at the Sheriff's Department with a case file on Lowery, which file he had left in O'Connor's office. Fountain spent the evening with O'Connor, and when he returned home for the night, he saw O'Connor's cruiser engaged in a high-speed chase and radioed into dispatch and directly to O'Connor for details, later going into the department and then to the command station. Fountain could not remember if he saw Yancey with the file at the command site, but he recalled that Yancey was assisting other agencies with the investigation. A week later, Fountain testified that he found a safe in the back seat of his personal truck, and he later opened it at Sikes's direction, finding about $350 in cash in the safe.

Lauren Sherling, an assistant district attorney in the circuit serving Montgomery County, was present at the mobile command station on the night of O'Connor's death. She saw Yancey at the command station and discussed suspect

_____

[5] Fountain appears to have been charged in this burglary along with Yancey although the indictment charges a "Joey Fountain" and Fountain is referred to as "Justin" at the hearing.

Lowery with Yancey, but she did not recall seeing him with any files or papers. Sherling was unable to testify regarding a timeline for the evening.

Officer Cody Clifton, who was working as a road seargent for Montgomery County at the time of O'Connor's death, testified that Yancey arrived at the mobile command station and assisted with the investigation of Lowery, giving possible locations for searches based on his previous work on Lowery's case.

Ronnie Bivens, who became chief deputy in Montgomery County after O'Connor's death, testified that he was with Yancey when he sustained his injury and testified that while serving a search warrant on a house and seizing some firearms, one of the weapons discharged, injuring Yancey's shoulder. Bivens testified that after reviewing the personnel files at the department, he discovered a return-to-work slip for Yancey, clearing him to return to work and to drive, which slip was dated July 29, 2015.[6] Bivens could not testify whether Yancey worked in some capacity between his injury and July 29 because Bivens was not employed at Montgomery County at that time.

Ricky Dykes testified that he drove his girlfriend, Kim Young (a dispatcher for the Department), to the Sheriff's Department on the night of O'Connor's death. He

---

[6] The slip was signed by Kathy Rudd.

was familiar with the officers at the department and said many were around and some were in Sheriff O'Connor's office while he was there. Dykes testified that Young had an application on her phone that received a video feed from the department security cameras, and he used his phone to record the feed showing the individuals leaving O'Connor's office because Young did not know how to save the video feed. He provided a copy to the Georgia Bureau of Investigation ("GBI"), and he did not know if the original footage existed. The video showed the open back door to the Sheriff's office with various men and one woman coming out, one of whom was carrying a safe; some time later, other individuals left, one of whom had a sling around one arm and was carrying papers. None of the individuals appeared to be concealing their identities or their presence in the office.

After O'Connor's death, the GBI was asked to investigate the break-in at his office. After reviewing the security footage, GBI investigators interviewed Yancey. Yancey told them that he had been called into work the night of O'Connor's death, that he was under the influence of pain medication and probably should not have been working, that he remembered hearing people inside O'Connor's office when he arrived at the sheriff's department, that he did not remember why he went inside the

office, that he did not remember removing any papers from within, and that he did not know what the papers were.

An audio recording of Yancey's interview with the GBI was admitted and played at the hearing, as well as a video of the events at O'Connor's office on the night of June 15. The court also allowed the State to admit a copy of the surveillance video taken by Dykes of Young's phone.

Following the hearing, the trial court entered an order ruling that OCGA § 17-7-52 did not protect Yancey because there was no evidence that he had been acting in the performance of his official duties during the alleged burglary.

1. Yancey argues that the trial court erred by holding that OCGA §§ 17-7-52 (a) and 45-11-4 (g) did not apply. We agree.

At the time of the incident and indictment, OCGA §§ 17-7-52 (a) (2015) provided that

> [b]efore an indictment against a present or former peace officer charging the officer with a crime which is alleged to have occurred while he or she was in the performance of his or her duties is returned by a grand jury, the officer shall be notified of the contemplated action by the district attorney of the county wherein the grand jury shall convene and the officer shall be afforded the rights provided in Code Section 45-11-4.

8

In turn, OCGA § 45-11-4 (2015), stated in relevant part that

> (f) [a]ny indictment brought pursuant to subsection (b) of this Code section shall specially set forth the merits of the complaint against the accused public officer. A copy of the proposed bill of indictment shall be served on the accused public officer at least 15 days before it is presented to the grand jury[; and that] (g) [t]he accused shall have the right to appear before the grand jury to make such sworn statement as he or she shall desire at the conclusion of the presentation of the state's evidence. The accused shall not be subject to examination, either direct or cross, and shall not have the right individually or through his or her counsel to examine the state's witnesses. The accused and his or her counsel shall have the right to be present during the presentation of all evidence and alleged statements of the accused on the proposed indictment, presentment, or accusation, after which the accused and his or her counsel shall retire instanter from the grand jury room to permit the grand jury to deliberate upon the indictment.

The protections afforded under these statutes, however,

> have been found not to apply to situations where officers have stepped aside from the performance of their official duties in order to commit crimes. For instance, we have held that officers charged with committing burglary, armed robbery and aggravated assault while on duty are not entitled to these rights inasmuch as the performance of their official duties does not include the commission of such crimes. Likewise, this

9

court has held that the performance of official duties does not include rape.[7]

Relying on *Mize v. State*,[8] the trial court found and the State now argues that the State was not required to notify Yancey of presentment to the grand jury or allow him to make statements to the grand jury prior to their return of the indictment because "performance of . . . official duties does not include the commission of burglaries."[9] In *Mize*, however, there was no argument that the officer was transporting accomplices to the scene of the burgled building for any reason related to his duties as a police officer; thus, even though he may have been wearing his uniform and carrying his department issued weapon during duty hours, his actions could not be characterized as being in performance of his duties.[10]

---

[7] (Footnotes omitted.) *State v. Galloway*, 270 Ga. App. 184, 185 (606 SE2d 273) (2004).

[8] 152 Ga. App. 190 (262 SE2d 492) (1979).

[9] Id. at 191-192 (1).

[10] See id. at 191-193 (1). See also *Morrill v. State*, 216 Ga. App. 468, 469-470 (2) (454 SE2d 796) (1995) (officer involved in burglary ring who assisted in crimes by monitoring police radio during the incidents while on duty was not protected by OCGA §§ 17-7-52 and 45-11-4).

10

In this case, although Yancey was not in the office during his regularly scheduled duty hours and normally did not have access to Sheriff O'Connor's office, there was substantial evidence that he entered the office in furtherance of the investigation of Lowery while he arguably was on call the night of O'Connor's death. Obviously, the circumstances of that night had most of the police forces of many of the surrounding counties responding to the command post outside of their normal assigned working hours, and there was some evidence that Yancey provided assistance into the investigation at the command post. While it may be the case that he and the other indicted individuals committed burglary that night, that is not the relevant inquiry when determining whether an individual is entitled to the protections of OCGA §§ 17-7-52 and 45-11-4.[11]

---

[11] See *Wiggins*, 280 Ga. at 270-271 (1) (holding that an officer was protected by OCGA §§ 17-7-52 and 45-11-4 when he falsified his daily activity sheet to cover up a sexual assault he committed while on duty), citing *State v. Lockett*, 259 Ga. App. 179, 181 (576 SE2d 582) (2003) ("on duty police officer charged with speeding and driving too fast for conditions was entitled to rights under OCGA §§ 17-7-52 and 45-11-4"); *State v. Roulain*, 159 Ga. App. 233, 234 (2) (283 SE2d 89) (1981) ("correctional officers who were charged with involuntary manslaughter because they confined a prisoner under conditions which led to his death by heat prostration did not step aside from the performance of their duties"). See also *Smith v. State*, 297 Ga. App. 300, 301-302 (676 SE2d 750) (2009) (officer protected by OCGA §§ 17-7-52 and 45-11-4 when overlapping hours at two jobs resulted in charges of false statements and writings against him).

Accordingly, we reverse the trial court's order denying the motion to quash the indictment.

2. Yancey contends that the video footage of the Sheriff's office from the night in question should not have been admitted for the trial court to view in relation to his motion to quash.[12] We disagree.

"Trial courts have broad discretion to determine whether a sufficient foundation has been provided for the introduction of evidence. We will not reverse the trial court's ruling in this regard unless there has been an abuse of that discretion."[13]

Pursuant to OCGA § 24-9-923 (c), "videotapes created by unmanned cameras 'shall be admissible in evidence when the court determines, based on competent evidence presented to the court,' that the video tends to reliably show the fact or facts for which it is offered."[14] In this case, although it is not clear why Young did not testify about the surveillance system at the hearing on the motion to quash, Dykes

---

[12] Because this issue could arise on remand, we address Yancey's second enumeration despite our holding in Division 1.

[13] *Sheppard v. State*, 300 Ga. App. 631, 634-635 (2) (686 SE2d 295) (2009).

[14] *Brannon v. State*, 298 Ga. 601, 609 (5) (783 SE2d 642) (2016).

testified as to the circumstances under which he created the video of the surveillance video. While the better practice to lay foundation may have been to have Young or another employee testify about the system, we discern no abuse of discretion by the trial court in admitting the video because Dykes testified as to the circumstances and was personally at the Sheriff's Department when the video was captured. Additionally, the date and time are visible prior to Dykes choosing the portion of the video presented at the hearing. The issues raised as to the State's failure to produce the original recording or from Young's failure to testify impact the weight and not the admissibility of the video.[15]

*Judgment reversed. Miller, P. J., and Reese, J., concur.*

---

[15] See, e.g., id.; *Dawson v. State*, 283 Ga. 315, 317-319 (3) (658 SE2d 755) (2008).